# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 20-1338V
UNPUBLISHED

| | |
|---|---|
| DIANNE RICE-HANSEN,<br><br>　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 9, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Kyle Edward Pozza*, U.S. Department of Justice, Washington, DC, for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On October 7, 2020, Dianne Rice-Hansen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting as a result of an influenza ("flu") vaccine received on September 7, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters (the "SPU").

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$180,752.68**, **representing $175,000.00 for actual pain and suffering and $5,752.68 for past unreimbursable expenses.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Relevant Procedural History

This case was activated on December 17, 2020 (ECF No. 16). On February 17, 2022, Respondent filed his Rule 4(c) Report conceding entitlement (ECF No. 42). A Ruling on Entitlement was subsequently entered on February 22, 2022 (ECF No. 43), and the parties engaged in damages discussions. However, the parties eventually reached an impasse, informing me that I would need to decide the disputed issues. (ECF No. 49). Petitioner thus filed a damages brief on June 16, 2022 (ECF No. 50), and Respondent reacted in opposition on September 8, 2022, with Petitioner's reply filed on September 28, 2022 (ECF Nos. 53, 54). The issue of damages is now ripe for resolution.

## II.     Relevant Medical History

On September 7, 2018, Petitioner received a flu vaccine in her left deltoid at Walgreens in Bangor, Maine. Ex. 1 at 12. She was 55 years old, and worked as a transportation technician. Ex. 2 at 236, 238.

The following month, on October 5, 2018, Petitioner called the office of her primary care physician ("PCP") reporting that she had received a flu shot on September 7th, and within 24 hours her arm started to hurt, and had gotten worse and she was now in excruciating pain. Ex. 2 at 503. She had tried heat and ice, with no relief. *Id.* She was seen the same day by Dr. Rita Aidoo, reporting severe left arm pain since she received the flu shot. *Id.* at 178-79. On examination, Petitioner exhibited left shoulder tenderness and pain. *Id.* at 180. Dr. Aidoo noted an area that was slightly higher on palpation. *Id.* Petitioner's range of motion ("ROM") was fully intact passively, but active ROM was limited by "due [to] pt [patient] hesitance." *Id.* Dr. Aidoo assessed Petitioner with pain of the left upper arm, and ordered an ultrasound and cyclobenzaprine. *Id.* at 181. Petitioner was instructed to move her shoulder joint frequently to avoid frozen shoulder. *Id.*

An ultrasound of Petitioner's left upper extremity was performed on October 8, 2018, with an unremarkable result. Ex. 2 at 210. On the same day, Petitioner sent a message to Dr. Aidoo reporting that the muscle relaxers were interfering with her work and not helping, and she planned to stop taking them. *Id.* at 504.

Petitioner was next seen by nurse practitioner ("NP") Christine Nealley on October 19, 2018. Ex. 2 at 236. She reported that her pain had not improved and that she was experiencing a decrease in movement which started within a week after the flu shot, plus extended pain after use of her arm, especially in association with movement. *Id.* On examination, she exhibited tenderness and decreased ROM. *Id.* at 239. NP Nealley assessed her with acute pain and decreased ROM of the left shoulder, and ordered an MRI and referred her to an orthopedist. *Id.*

On November 6, 2018, Petitioner had a left shoulder MRI. Ex. 2 at 330. The MRI revealed infraspinatus tendinosis, with a possible tiny partial thickness tear, and mild to moderate acromioclavicular ("AC") hypertrophic changes with inferior beak like spurring. *Id.*

On November 30, 2018, Petitioner presented to orthopedist Dr. Jacob Brooks reporting left shoulder pain. Ex. 6 at 21. Petitioner reported left shoulder pain that began after a flu shot and had not remitted. *Id.* She rated her pain as 6 on a scale of 1-10. Id. at 24. The pain was described as constant, interfering with activities of daily living ("ADLs"). *Id.* at 21. On examination, Petitioner was "exquisitely tender through range of motion," and had pain with forward flexion, abduction, and internal and external rotation. *Id.* at 25. Her symptoms were worse above 90 degrees of forward flexion or 90 degrees of abduction. *Id.* X-rays were normal, with some early arthritic changes to the AC joint. *Id.* Dr. Brooks assessed her with adhesive capsulitis of the left shoulder, and thought she had an inflammatory subacromial bursitis. *Id.* at 26. He recommended oral steroids, with a possible corticosteroid injection if she did not obtain relief from oral steroids. *Id.* He noted that she was unable to take ibuprofen. *Id.*

On December 6, 2018, Petitioner called Dr. Brooks, reporting that the prednisone helped but she was still in some pain. Ex. 18 at 12. Dr. Brooks again prescribed prednisone. *Id.* She reached out again to Dr. Brooks the following month (January 21, 2019), reporting that her shoulder was not any better, with minor transient improvement when she was medicated with prednisone (although the pain returned once the medicine wore off). Ex. 18 at 11. She had been on another course of prednisone for another condition and her shoulder felt good when she was on it, but after stopping her shoulder hurt all the time. *Id.*

Petitioner returned to Dr. Brooks on February 4, 2019. Ex. 6 at 17. Petitioner again reported that prednisone provided significant relief of her symptoms, but they returned when she stopped prednisone. *Id.* She reported improvement but that she was not 100%. *Id.* A corticosteroid injection was administered. *Id.* at 19.

On March 18, 2019, Petitioner was seen for a follow up by orthopedic physician assistant ("PA") Karis Ann Filteau. Ex. 6 at 12. Petitioner reported that the corticosteroid injection she received at her last appointment with Dr. Brooks did not provide any relief. *Id.* She reported substantial pain surrounding the deltoid, where she received the flu vaccine. *Id.* PA Filteau assessed Petitioner with adhesive capsulitis of the left shoulder, and referred her for physical therapy. *Id.* at 15. Petitioner declined a repeat corticosteroid injection. *Id.*

On March 20, 2019, Petitioner underwent a physical therapy ("PT") initial evaluation for left shoulder pain that started after a flu shot in September. Ex. 13 at 1. Petitioner reported that initially she had excruciating pain and difficulty moving her arm, but could now move her arm with pain in the front or her left shoulder. *Id*. She reported pain with work duties, ADLs, chores, and recreational activities. *Id*. She reported current pain of 6/10, with a range of 5 at best to 9 at worst. *Id*. On examination, she had active ROM within normal limits, with pain at all end ranges. *Id*. at 2. Her left shoulder strength was reduced compared to her right shoulder in flexion, abduction, and internal rotation. *Id*. She was assessed as having moderate pain with end range motion and weakness due to pain. *Id*. at 3. She had signs and symptoms consistent with biceps tendonitis and possible impingement. *Id*. A treatment plan was established for her to attend physical therapy twice a week for eight weeks. *Id*. Petitioner attended thirteen additional sessions between March 25 and May 16, 2019. Ex. 13 at 4-41; Ex. 16 at 22-24. During this time, the records indicated that she reported pain levels between five and nine on a scale of 0-10. *Id*. She reported temporary relief from PT, but no prolonged improvement. Ex. 13 at 28.

On April 26, 2019, Petitioner was seen for a follow up by orthopedic PA Filteau. Ex. 6 at 7. Petitioner reported that oral prednisone had been the most beneficial, but that her symptoms returned as soon as she stopped taking it. *Id*. Physical therapy had only been slightly helpful, and the exercises seemed to worsen her pain although ultrasound ionophoresis was beneficial. *Id*. She continued to report pain in the left deltoid region, as well as burning and numbness radiating down the left upper extremity into her left ring finger and small finger. *Id*. PA Filteau noted that Petitioner's symptoms had been ongoing for over seven months and that conservative measures had provided little to no relief. *Id*. Because Petitioner was now describing symptoms consistent with ulnar neuropathy, PA Filteau ordered an EMG. *Id*.

On May 6, 2019, Petitioner underwent an EMG and nerve conduction study of the left upper extremity. Ex. 3 at 674-75. The study was normal, with no evidence of any focal mononeuropathy, peripheral polyneuropathy, brachial plexopathy, cervical radiculopathy, or myopathic process. *Id*. Dr. Brooks called Petitioner two days later reporting the normal result. Ex. 18 at 9. Dr. Brooks recommended that Petitioner try dry needling, and said that if that was unsuccessful surgery would be the next step. *Id*.

On May 23, 2019, Petitioner was seen for PT. Ex. 16 at 19. There was no significant change in her functional status since the initial visit despite a total of fifteen sessions. *Id*. Petitioner appeared to have some improvements initially, but the apparent improvements quickly subsided. *Id*. at 21. The physical therapist noted that the certified dry needling provider did not feel comfortable treating petitioner. *Id*. Thus, Petitioner was discharged from PT and instructed to continue her home exercise program and return to

4

her physician for further assessment. *Id.* On the same day, Petitioner called Dr. Brooks to discuss next steps. Ex. 18 at 8. He recommended surgery. *Id.*

On August 26, 2019, Petitioner was seen by Dr. Brooks for left shoulder pain. Ex. 10 at 18. She reported constant pain and stiffness, and that her symptoms were getting progressively worse. *Id.* She had limited relief from her steroid injection and thus declined further injections. *Id.* She was unable to take anti-inflammatory medications due to a previous anaphylactic reaction. *Id.* Dr. Brooks stated that he would not recommend further injections. *Id.* at 20. He believed she would benefit from surgery, and Petitioner agreed to schedule it when her work schedule permitted. *Id.* In the meantime, he prescribed additional prednisone. *Id.*

Petitioner was seen by orthopedic PA Carolyn Pollard Savage for a pre-operative evaluation on September 12, 2019. Ex. 10 at 12. Petitioner reported ongoing, progressively worsening symptoms in her left shoulder, without significant response from the most recent course of prednisone. *Id.* Petitioner elected to proceed with surgery. *Id.*

On September 25, 2019, Petitioner underwent left shoulder arthroscopic capsular release with subacromial decompression and lysis of massive adhesions. Ex. 7 at 4-5. An intrascalene block was administered. Petitioner was found to have "thick inflammatory scarring anteriorly," which was released arthroscopically. *Id.* at 4. Dr. Brooks found "thick fibrous adhesive bands and inflammatory scarring" in the subacromial space. *Id.* He performed subacromial decompression and lysis of the adhesions. *Id.* at 4-5. Bony spurs were shaved from the shoulder, and he injected Kenalog and lidocaine to prevent recurrence of her adhesions. *Id.*

On October 9, 2019, Petitioner was seen by PA Pollard Savage for a post-operative evaluation. Ex. 10 at 8. Petitioner reported that overall she was doing well, and took a very short course of pain medication, and was not taking any over the counter medications or applying any topical remedies. *Id.* On examination, her surgical sites were healing well, and she demonstrated gentle active ROM with about 90 degrees of forward flexion and abduction. *Id.* at 10. She was using her left shoulder without any specific restrictions. *Id.* She was referred for PT. *Id.*

On October 10, 2019, Petitioner underwent a PT initial evaluation. Ex. 16 at 16. Petitioner reported that the arm was most stiff in the morning. *Id.* She reported pain of 6/10, with a range of 0/10 at best and 9/10 at worst. *Id.* She reported some intermittent tingling/pain radiating down her left upper extremity. *Id.* at 17. Her ROM was within functional limits, but she had pain at all end ranges and was grossly weaker on the left side compared to the right. *Id.* She had mild to moderate tenderness to palpation around the left shoulder, and was "functionally limited in all areas of her life." *Id.* at 17-18. A

5

treatment plan involving two sessions a week for eight weeks was established. *Id.* at 18. Petitioner attended five additional PT sessions through October 31, 2019. *Id.* at 1-15. During this time, she reported pain levels ranging from zero to nine on a scale of 0-10.

On November 6, 2019, Petitioner was seen by PA Pollard Savage for a follow up. Ex. 10 at 4. She reported that prior to surgery, she experienced pain all over her left shoulder, but following surgery it was isolated over the front aspect of the shoulder over her anterior scar. *Id.* She had made excellent progress with her ROM in PT. *Id.* On examination, she exhibited good healing, with an oval shaped tenderness over the anterior surgical site. *Id.* at 6. She demonstrated 160 degrees ROM in forward flexion, and 180 degrees in abduction. *Id.* PA Pollard Savage thought the tenderness was related to scar tissue formation. *Id.* She acknowledged that Petitioner was unable to take non-steroidal anti-inflammatory medications ("NSAIDs"), and recommended topical anti-inflammatories such as turmeric. *Id.*

Petitioner was seen by orthopedic PA Filteau on December 20, 2019. Ex. 12 at 4. She reported that he symptoms continued to improve and that she no longer experienced constant pain and limited ROM, but continued to have occasional aching. *Id.* She had been discharged from PT and continued to do home exercises. *Id.* PA Filteau was concerned that Petitioner was reforming scar tissue and continuing to struggle with tendinitis. *Id.* at 7. PA Filteau thought Petitioner may benefit from backing off on some of the PT exercises, and recommended that Petitioner follow up in three months. *Id.*

Petitioner attended an additional thirteen PT sessions between November 5 and December 31, 2019. Ex. 14 at 2-61. Initially, she reported pain levels ranging from zero to nine on a scale of 0-10. Ex. 14 at 10. Starting on November 19, 2019, her pain levels improved, with a range of zero to seven on a scale of 0-10. *Id.* at 34. She reported improvement, but continued to have discomfort primarily along the lateral and anterior portion of her deltoid, glenohumeral joint, and biceps long head tendon. *Id.* She continued to report difficulty with chores, activities, and sleep. *Id.* At the December 31st session, she was discharged from PT, with recommendations to continue her home exercise program. *Id.* at 55. Her functional status was 80% improved, although she was still experiencing occasional discomfort. *Id.* She had nearly met all goals, and exhibited improved strength and less discomfort with all movement. *Id.* at 57. She continued to experience mild stiffness and discomfort with internal rotation. *Id.*

On March 16, 2020, Petitioner returned to Dr. Brooks. Ex. 15 at 9. She reported ongoing left shoulder pain and stiffness, although her motion and pain were improved from prior to surgery. *Id.* Dr. Brooks recommended that she continue to work on ROM and strength, and stated that she could start massage therapy. *Id.* at 11. She was instructed to return in three months. *Id.*

On June 8, 2020, Petitioner had a virtual appointment with Dr. Brooks. Ex. 15 at 7. She reported that due to the COVID-19 pandemic she had been unable to attend massage therapy, and had plateaued in movement. *Id.* She had not improved with topical treatments. *Id.* On examination, she had pain with flexion, abduction, and internal and external rotation. *Id.* at 8. She had stiffness and her ROM was 80 degrees in flexion and abduction, and 15 degrees in internal rotation. *Id.* Dr. Brooks recommended that she continue non-operative management and be seen in the office to discuss doing a manipulation under anesthesia ("MUA"). *Id.*

Petitioner was seen by Dr. Brooks in the office on June 26, 2020. Ex. 15 at 4. She reported pain and persistent discomfort, as well as difficulty with ADLs such as getting dressed. *Id.* On examination, her ROM was 90 degrees in flexion and abduction and 15 degrees in internal and external rotation. *Id.* at 6. Dr. Brooks ordered a repeat MRI. *Id.*

Petitioner's repeat left shoulder MRI on July 6, 2020 showed high grade chondomalacia of the glenoid cup and dry capsulitis of the glenohumeral joint. Ex. 15 at 12. In addition, it showed active capsulitis of the AC joint with inflammation of the subacromial bursa, mild tendinopathy of the supraspinatus and infraspinatus and bursal sided fraying of the supraspinatus myotendinous junction, and dry capsulitis with mild adhesive component in the axillary region. *Id.*

Petitioner had a telephone appointment with Dr. Brooks on July 31, 2020. Ex. 23 at 4. Dr. Brooks recommended an MUA, and Petitioner elected to proceed. *Id.* at 5.

On September 16, 2020, Petitioner was seen by PA Filteau for a pre-operative evaluation. Ex. 23 at 7. Petitioner reported that she had benefitted from the arthroscopic surgery done the prior year, but the pain, stiffness, and reduced ROM recurred despite aggressive PT and other conservative measures. *Id.* On examination, she had limited active ROM of 90 degrees in forward flexion and abduction and 20 degrees of internal and external rotation. *Id.* at 11. She was assessed with adhesive capsulitis of the left shoulder, and an MUA was planned. *Id.* at 12.

On September 23, 2020, Petitioner underwent a left shoulder MUA. Ex. 24 at 2. She was put under general anesthesia. *Id.* Dr. Brooks performed the procedure, and noted that there was a "full release of soft tissue," and the procedure was successful. *Id.*

Petitioner began post-operative PT with an initial evaluation on September 28, 2020. Ex. 22 at 16. She reported that following the MUA, her shoulder had been moving much easier and felt better. *Id.* She reported continued limitations with ADLs, self care, carrying objects, washing her back, and recreational activity. *Id.* Her pain was 0/10,

ranging from 0/10 at best to 3/10 at worst. *Id.* Her active ROM was within normal limits, with tightness and mild discomfort with end range internal rotation, flexion, and abduction. *Id.* at 17. Her passive ROM was within normal limits. *Id.* She was assessed as having mild pain with end range mobility and high intensity activity. *Id.* at 18. The primary goal of PT was to optimize functional mobility. *Id.* A treatment plan of two sessions a week for six weeks was established. *Id.*

On October 7, 2020, Petitioner returned to PA Pollard Savage. Ex. 23 at 14. Petitioner reported that overall things were going fairly well. *Id.* She continued to notice pulling sensations and difficulty with internal rotation on the front aspect of her shoulder. *Id.* Otherwise she was doing well, with little pain at rest or with other ranges of motion. *Id.* She was doing PT once a week, as well as doing stretching exercises on her own. *Id.* She was not experiencing numbness or tingling, and had no other complaints. *Id.* On examination, she demonstrated smooth active ROM with full forward flexion, 160 degrees of abduction, 30 degrees of external rotation, and 20 degrees of internal rotation, with some discomfort. *Id.* at 17. She was encouraged to continue with PT and home exercises, and return in a month. *Id.*

Petitioner was seen by Dr. Brooks on November 2, 2020. Ex. 23 at 18. She reported significant improvement, and was no longer having any pain. *Id.* She was continuing to work on ROM and strengthening. *Id.* On examination, her left shoulder ROM was 180 degrees in flexion, 100 degrees in abduction, and 20 degrees in internal rotation. *Id.* at 20.

Petitioner attended five additional PT sessions between October 6 and November 3, 2020, and was discharged on November 3rd. Ex. 22 at 1-15. At discharge, she had made 80-100% progress on all of her short and long term goals. *Id.* at 1. Her shoulder active and passive ROM were within normal limits. *Id.* at 2. She continued to experience tenderness to palpation around the left glenohumeral joint, but overall had minimal soreness. *Id.* at 2-3. She was advised to continue her home exercise program. *Id.* at 3.

On February 1, 2021, Petitioner returned to PA Pollard Savage for a follow up. Ex. 23 at 21. She reported that since her last appointment, she had continued to improve, and typically did not have any pain or discomfort and thought she was back to full ROM. *Id.* On examination, she had some tightness over the trapezius musculature but was otherwise nontender. *Id.* at 24. She had full ROM and smooth internal and external rotation. *Id.* She stated that she would return to the office on an as-needed basis. *Id.*

8

### III.   Testimony and/or Affidavits

Petitioner filed an affidavit in support of her claim. Ex. 19. Petitioner avers that she felt immediate pain during the September 7, 2018 vaccination. *Id.* at ¶ 4. After the vaccination, she noted that the bandage covering the vaccination site was very high on her shoulder. *Id.* She spent the rest of that day, a Friday, at work, and by the end of the day her left shoulder was very sore. *Id.* Over the weekend the pain worsened. *Id.* at ¶ 5.

About two or three weeks after vaccination, Petitioner went to Walgreens to pick up a prescription, and told the pharmacist that her shoulder was sore. Ex. 19 at ¶ 5. The pharmacy manager recommended trying heat or ice. *Id.* She averred that she contacted the pharmacy again the first week of October 2018, and was told to see her PCP, which she did. *Id.* at ¶ 6.

Petitioner asserts that her injury affected her work. She explains that her job as a transportation technician involved collecting several types of data manually, which required extensive walking and lifting equipment weighing up to 35 pounds. Ex. 19 at ¶ 2. She continued to work, but her injury affected her job performance, daily life, and happiness. *Id.* at ¶ 9.

Petitioner avers that the injury interfered with her sleep and woke her at night. Ex. 19 at ¶ 10. Tylenol, ice, and heat did not help. *Id.* Even getting out of bed in the morning was painful. *Id.* at ¶ 11. She continued to move her shoulder as instructed to avoid a frozen shoulder, but doing so was painful. *Id.*

Petitioner obtained some pain relief with oral prednisone. Ex. 19 at ¶ 13. However, once she stopped the medication, the pain returned. *Id.* She states that the cortisone injection she received in February 2019 "did not relieve my shoulder pain," and thus no further injections were done. *Id.* at ¶ 14. Her first round of physical therapy in the spring of 2019 aggravated, rather than improving, her pain. *Id.* at ¶ 16.

Petitioner averred that by the end of May 2019, her "life as it was before the vaccine had been turned upside down." Ex. 19 at ¶ 19. Using her left arm to do minor tasks such as drying her hair, putting on a seat belt, carrying groceries, and typing were painful. *Id.* She could not lay on her left side, and used a heating pad at night for pain relief. *Id.*

Petitioner states that by the end of the summer of 2019, she was in extreme discomfort even at rest. Ex. 19 at ¶ 20. She explained that she held off on scheduling her surgery until after the busy summer season at work. *Id.* at ¶ 18. After surgery, she did twelve weeks of PT and was discharged. *Id.* at ¶ 22. At that time, her pain level had improved and fluctuated between 3/10 and 6/10 and she had full ROM. *Id.* at ¶ 23.

Petitioner avers that at her six month post-operative appointment in mid-March 2020, her shoulder pain had increased and she had stiffness and limited ROM. Ex. 19 at ¶ 24. Over the following three months, her shoulder worsened. *Id.* Consequently, she underwent a MUA in September 2020. *Id.* at ¶ 26.

Petitioner asserts that because of her injury she has not been able to use her bike, kayak, or jet ski. Ex. 19 at ¶ 27. Daily activities cause intense pain, and sleep is disrupted by pain. *Id.*

### IV. The Parties' Arguments

The parties agree that Petitioner is entitled to unreimbursed expenses of $5,752.68. Petitioner's Brief ("Br.") at 25; Respondent's Brief in Opposition ("Opp.") at 2 n.1. In addition, Petitioner states that although she used a substantial amount of sick time due to her shoulder injury, she does not make a specific claim for past lost wages. Br. at 25. However, "the overall [e]ffect that her SIRVA had on her professional life is factored into her claim for pain and suffering." *Id.* Petitioner does not claim future medical expenses or lost wages. *Id.* at 25-26. Thus, the only disputed matter is the amount of damages Petitioner is entitled to for actual pain and suffering and emotional distress.

Petitioner requests an award of $185,000.00. Br. at 33. She asserts this award is justified by her lengthy and involved course of treatment, including arthroscopic surgery, MUA, a steroid injection, two MRIs, an EMG/NCS, three rounds of PT involving 39 sessions,[3] massage therapy, and several courses of prescription medicine. Br. at 26-28. Petitioner asserts that her course of treatment lasted for 26 months without any substantial gaps in treatment. *Id.* at 28. Petitioner emphasizes the impact her injury has had on her quality of life. *Id.*

Petitioner acknowledges that MUA is not an open and invasive surgery, but cites caselaw recognizing that "the necessity for general anesthesia indicates great pain," even if the procedure itself is not notably intrusive. *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *6 (Fed. Cl. Spec. Mstr. May 2, 2019).

Petitioner cites several cases more generally to support her award request, but helpfully acknowledges that her case is most comparable to *M.W. v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021) (awarding $195,000.00 in pain and suffering, and a total award of $202,996.30) and *Pruitt v. Sec'y of Health & Human Servs.*, No. 17-757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr.

---

[3] Although Petitioner asserts that she attended 39 sessions, I find that the record includes 40 sessions. The difference is immaterial.

Oct. 29, 2021) (awarding $185,000.00 in pain and suffering, and a total award of $186,799.62). Petitioner emphasizes that she did not have a lapse in treatment, as did the petitioners in *M.W.* and *Pruitt*. Br. at 32. Petitioner acknowledges that the petitioner in *M.W.* underwent more PT than she did, but notes that the *M.W.* petitioner did not have any cortisone injections. *Id.* By contrast, the petitioner in *Pruitt* participated in only 14 PT sessions, while Petitioner attended 39 sessions over three courses in addition to massage therapy. *Id.* Petitioner adds that she was unable to take NSAIDs recommended due to a prior anaphylactic reaction, and asserts this should be factored into the award. *Id.*

Respondent proposes a pain and suffering award of $137,500.00. Opp. at 6. Respondent asserts that Petitioner's course of treatment in this case was "significantly milder than in *M.W.* and *Pruitt*." *Id.* The petitioner in *Pruitt*, he argues, stated that her shoulder was "killing her" the day after vaccination, and received three steroid injections and two surgeries over a four year period, contrasted with one steroid injection and surgery followed by a second procedure, an MUA, over slightly more than two years in this case. Opp. at 7. The course of treatment in *M.W.* also spanned nearly four years, and involved two surgeries, 71 sessions of PT, and three MRIs. Opp. at 7. Respondent asserts that Petitioner underwent about 50% less PT than the petitioner in *M.W.*, her second procedure was an MUA, and Petitioner's treatment spanned just over two years. *Id.* Respondent also asserts that the petitioner in *M.W.* was still receiving treatment at the time of the hearing, while in this case Petitioner was doing well without pain or discomfort at the time of discharge. *Id.* Thus, in Respondent's view, *M.W.* and *Pruitt* are "inappropriate to use as a guide to determine appropriate compensation for pain and suffering in this case." *Id.*

Respondent argues a better comparable is *Blanco v. Sec'y of Health & Human Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020). The petitioner in that case attended PT, received four steroid injections, three MRIs, massage therapy, acupuncture, and arthroscopic surgery over the course of two years, and made a substantial recovery after surgery. Opp. at 7-8. Respondent asserts that although the petitioner in *Blanco* did not undergo an MUA, she received three more steroid injections and Respondent characterizes the *Blanco* petitioner's initial surgery as more extensive. *Id.* at 8.

Petitioner disagrees with Respondent's characterization of the *Blanco* petitioner's surgery as more extensive than Petitioner's arthroscopic surgery. Petitioner's Reply ("Reply") at 3 n. 6. The petitioner in *Blanco* had a substantial recovery following her first, and only, surgery. *Id.* at 3. In contrast, Petitioner continued to experience residual symptoms, and six months after her first surgery returned to her orthopedist due to ongoing left shoulder pain, stiffness, tightness, and decreased ROM *Id.* at 3-4. A second MRI revealed substantial continued injury. *Id.* at 4. Petitioner argues that her "experience

11

of requiring a second shoulder procedure under general anesthesia one year after her first extensive surgery is overwhelmingly different than the substantial recovery enjoyed by the petitioner in *Blanco*, who one year after her only surgery indicated she was feeling good and stated, 'thank God it's over.' " *Id.* Petitioner reiterates her position that cases involving petitioners who underwent two surgical procedures are appropriate comparable cases. *Id.* at 4-5.

Petitioner also disputes Respondent's claim that her injury was significantly milder than *M.W.* and *Pruitt*. Reply at 5. Petitioner acknowledges that the *Pruitt* petitioner's treatment course spanned four years, but notes that this included a significant gap in treatment, including between her two surgeries. *Id.* Petitioner adds that she underwent much more PT than the *Pruitt* petitioner. The *M.W.* petitioner had a treatment course that included a gap of more than a year, and did not receive any cortisone injections. *Id.* at 6. Petitioner notes that a second treatment gap in *M.W.* was considered reasonable due to the COVID-19 pandemic, and asserts that the fact that Petitioner sought care for her shoulder symptoms continuously, including during the height of the pandemic, speaks to the severity of her symptoms. *Id.*

Petitioner additionally cites *Lavigne v. Sec'y of Health & Human Servs.*, No. 19-1298V, 2022 WL 2275853, at *6 (Fed. Cl. Spec. Mstr. May 12, 2022) in support of her proposed award. The *Lavigne* petitioner underwent two surgeries, six steroid injections, two rounds of PT, and several medications over the course of a year and a half, and was awarded $198,000.00 for pain and suffering. Reply at 7. Petitioner acknowledges that she did not receive as many cortisone injections as the *Lavigne* petitioner, but asserts she had similar treatment and a somewhat longer duration of treatment. *Id.*

### V.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### VI.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my final determination on the circumstances of this case.

The record establishes that Petitioner's injury and treatment course were on the more serious side. Petitioner underwent an arthroscopic surgery and MUA, three rounds of PT including 40 sessions, a cortisone injection, and numerous medications, continuing over a 26 month period. Petitioner experienced relief after her arthroscopic surgery, but her symptoms gradually returned, resulting in a manipulation under general anesthesia a year later. Petitioner was diagnosed with adhesive capsulitis, and had significant MRI findings. That she was unable to take NSAIDs negatively impacted her ability to obtain pain relief.

I find that this case is most comparable to *M.W.* and *Pruitt* (Petitioner's favored cites). However, the injuries in those cases continued for a longer period of time, albeit with treatment gaps. In addition, the *M.W.* petitioner had significantly more PT over a longer period of time, and the petitioner in *Pruitt* had more cortisone injections. I find that Petitioner's second procedure, an MUA, was less invasive than surgery, but still involved pain significant enough for general anesthesia to be used. I consider this to merit an award approaching, but slightly lower than, the cases where petitioners required two surgical procedures.

The only case Respondent relies on, *Blanco*, by contrast, is not on point. Respondent seems to dismiss the significance of undergoing a second procedure under general anesthesia, a year after arthroscopic surgery. The fact that Respondent has not cited *any* cases involving two procedures under general anesthesia that would support his proposed amount is telling. Respondent has less persuasively substantiated his preferred award sum.

Accordingly, I find that $**175,000.00**  is a reasonable and appropriate award for

past pain and suffering in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $175,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[5] I also find that Petitioner is entitled to $5,752.68 in actual unreimbursable expenses.**

I therefore **award Petitioner a lump sum payment of $180,752.68 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision, absent a timely motion for review.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[5] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.